# In the United States Court of Federal Claims

No. 16-336C
(Filed: August 5, 2016)
FILED UNDER SEAL
REISSUED NOT FOR PUBLICATION AUGUST 29, 2016[1]

| | |
|---|---|
| **FLIGHTSAFETY INTERNATIONAL, INC.,** Plaintiff, v. **THE UNITED STATES,** Defendant, and **CAE USA, INC.,** Defendant-Intervenor | Post-Award Bid Protest Motions for Summary Judgment on the Administrative Record; *Honeywell v. United States*, 870 F.2d 644 (Fed. Cir. 1989); Arbitrary, capricious, abuse of discretion, or not in accordance with law. |

## OPINION AND ORDER

**DAMICH**, Senior Judge:

Plaintiff, FlightSafety International Inc. ("FSI") brings this bid protest challenging a contract award made by the U.S. Department of Army ("the Army") to CAE USA Inc. ("CAE") under Solicitation No. 911S0-13-R-0009 ("the Solicitation"). The Solicitation sought Fixed Wing Flight Training, Flight Training Support, and Flight Training Service for aircrew personnel at Fort Rucker, Alabama. FSI challenges the award as arbitrary and capricious, or otherwise inconsistent with applicable law and seeks a permanent injunction of award performance. FSI further asks that the injunction require the Army to take corrective action to amend the

[1] The original Opinion was filed under seal. The parties have advised as to the necessary redactions and those redactions have been made in this public opinion. Redacted sections appear with brackets as follows: "[. . .]."

Solicitation to inform the offerors as to the Army's actual requirements and conduct a competition based on those requirements.

Before the Court are the parties' Cross Motions for Judgment on the Administrative Record. Oral argument limited to certain issues was held on August 4, 2016. For the reasons set forth below, the Government's and Intervenor's Cross Motions for Judgment on the Administrative Record are **granted**, and FSI's Motion for Judgment on the Administrative Record is **denied**. The Court further **denies as moot** Plaintiff's Motion for Injunctive Relief

## I. History

Previously, on June 3, 2015, the Army awarded the contract to CAE. In the previous case, FSI claimed that the Army erred in awarding the contract to CAE without holding discussions with the other bidders. Specifically, FSI argued that the Army unreasonably assigned two "Unacceptable" ratings to FSI's proposal and without any regard to DFARS 215.306(c)(1), which was included in the Solicitation, requiring the contracting officers to hold discussions and perform a best value analysis. FSI also argued that 'innovation' was erroneously factored into the evaluation process. *FlightSafety Int'l Inc. v. United States*, CFC Dkt. No. 15-1010. The Court agreed with FSI and granted FSI's motion for a preliminary injunction. *See* Order, Sept. 15, 2015, Docket No. 12.

The Army then took corrective action by conducting written discussions with CAE and FSI. During this time, it was necessary to extend the existing contract with FSI, as the incumbent contractor. The contract was extended by modification dated September 29, 2015, for a period of 12 months ("the bridge contract"). The modification indicated, in an item labeled "SAVINGS CLAUSE," that, if FSI were to receive the new contract, the cost of the bridge contract would be reduced by $8,972,240.00, which is the sum of two cost items that would no longer be required in that event. In its bid, FSI did not reduce its pricing by this amount, but it did place in a footnote to the "OVERALL GRAND TOTAL" price a reminder of price reduction recited in the savings clause.

## II. Facts

### A. The Solicitation's Terms

On October 20, 2014, the Army issued the Solicitation seeking aircraft training services to be provided at Fort Rucker.[2] The Solicitation required the awardee to provide "all personnel, supervision, as well as certain aircraft, flight simulators, and real property facilities in addition to supporting equipment and materials necessary." Administrative Record ("AR") 96. The Solicitation further provided that the awardee would train Army pilots to fly Beechcraft C-12U

[2] The final Solicitation was amended seven times, with the final Amended Solicitation being issued on December 23, 2014.

and C-12V aircraft, AR 96-97, 111, and Air Force pilots would be trained on simulators to fly the Air Force C-12 C/D configuration, AR 550, 740.

The Solicitation specified that the award would be made based on the best value tradeoff. AR 203. To that end, the Solicitation described eight evaluation factors: (1) Facilities; (2) Quality Control; (3) Management; (4) Staffing, Recruitment, and Retention; (5) Aircraft and Simulators; (6) Past Performance; (7) Small Business Participation; and (8) Price. AR 204. Evaluation factors 1-3 were to be rated acceptable or unacceptable and would not be included in the trade-off consideration. AR 203. The evaluation factors 4-7, when combined, were to be weighed "approximately equal to price." *Id*.

Notwithstanding the eight factors listed above, the Solicitation further advised offerors that:

> [t]he Government is looking for innovative ideas in training methodology and innovation in the equipment for training. A proposal that has better training processes/procedures/simulators that ensures the best possible qualified pilots may be worth more to the government that than a proposal that just meets the minimum needs.

AR 202.

With regard to Price (Factor 8) the Solicitation read in pertinent part:

> Price will not be scored or rated. Evaluation of price will be performed using one more of the price analysis techniques in FAR 15.404-1(b). Through these techniques the Government will determine whether prices are reasonable, complete and balanced. . . .

AR 210.

**B. The Savings Clause in the Bridge Contract**

The bridge contract that extended FSI's training services for 12 months (to September 30, 2016) included the following item:

> SAVINGS CLAUSE . . . In the event [FSI] is awarded the follow-on-7 year contract for the Flight Training Services, costs for FY 16 under this contract for additional ODC Asset Costs of $6,366,382 and the Employee Retention Incentive Plan of $2,605,858 would no longer be required.
>
> Thus the negotiated price of Mod P00157 would be reduced by $8,972,240 . . .

Compl. Ex. 3.

**C. The Award**

March 1, 2016, the Army again awarded CAE the flight training contract, the reasons being documented in a Source Selection Decision Document ("SSDD"). The Source Selection Authority ("SSA") compared the strengths and weaknesses of each proposal as previously scored by the Source Selection Evaluation Board ("SSEB") to determine the best value.

In sum, the SSA assigned the following number of strengths and weaknesses to CAE's and FSI's proposals as follows:

| Offeror | | Factor 4 (Staffing, Recruitment, and Retention) | Factor 5 (Aircraft and Simulations) | Factor 4 & 5 (Technical Risk) |
|---|---|---|---|---|
| CAE | Strengths | 11 | 14 | 1 |
| | Weaknesses | 0 | 0 | 0 |
| FSI | Strengths | 3 | 4 | 2 |
| | Weaknesses | 1 | 1 | 2 |

Pl. MJAR at 7.

In his report, the SSA explained that CAE's proposal took an innovative approach. AR 2597. He then assigned various strengths to CAE's proposal. These included a new facility that would include classrooms, [. . .], and training spaces. AR 2585, 2587. Also included was that training and services would be housed at one location. AR 2585, 2588. In addition, CAE offered [. . .]. AR 2597. The SSA also assigned strengths based on the staff proposed, the use of specific subcontractors, and for the training offered by this staff. AR 2584, 2586. He also assigned strengths to CAE for its use of the G120TP aircraft. AR 2589-90, 2591-96.

FSI's evaluation was also detailed by the SSA. The SSA noted that FSI intended to use two existing training facilities that met technical acceptability. AR 2593. The SSA identified strength in FSI for being the incumbent and "has very few changes to make post award." AR at 2587. In addition, strengths were assigned for the staff proposed, its choice of aircraft, and its use of technology. AR 2585, 2587-88, 2592. FSI's evaluation included several weaknesses, including a lack of information regarding the trainers' qualifications and the possibility that more FAA requirements would be needed with regard to the aircraft proposed. AR 2592.

With regard to pricing, the SSA refused to take into consideration FSI's offer to reduce the price of the current contract by $8.9 million stating:

> in the price evaluation wording of the evaluation criteria, it does not allow me to look outside this proposal for pricing. According to Factor 8 [Price], the analysis is whether the prices are reasonable, complete and balanced. The evaluation of the price has been completed in accordance with only the evaluation criteria in the solicitation, which excludes the offer on the 2015

> contract price. It would not be appropriate to look at the September 2015 award as that is extraneous to this contracting action. Furthermore, each contract stands on its own.

AR at 2597.

CAE's was $16.5 million more than FSI's price, not including the $8.9 price reduction included in the bridge contract. In regard to the price differential, the SSA noted that:

> [f]or $2.3M additional dollars a year, the government reaps greater benefits from the CAE proposal. In a side by side comparison of CAE and FSI, CAE provides the better offer. . . . While the opportunity to save the government $16.5M is something I considered for a long time, the goal of this competition is to improve the Fixed Wing training program and to obtain the program the ensure the best possible qualified pilots. The proposal from CAE USA ensures Fort Rucker has the best possible qualified pilots.

*Id*.

In the end, the SSA concluded that "the enhanced training and safety value along with the better training processes/ procedures and simulators in the proposal make the CAE proposal the best value to the government, notwithstanding its higher price." AR at 2598. The contract was then awarded to CAE. *Id.* This bid protest followed.

## III. Standard of Review

This Court's bid protest jurisdiction is provided by the Tucker Act. 28 U.S.C. § 1491(b) (2012). In a bid protest case, the court applies the standard of review under section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, and may not set aside an agency's action unless the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1252 (Fed. Cir. 2015) (quoting *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1285 (Fed. Cir. 2010)). "The court's task is to determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Savantage*, 595 F.3d at 1285-86); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

The Competition in Contracting Act ("CICA"), Pub. L. No. 98-369. 98 Stat. (1984) (codified in part as amended at 10 U.S.C. 2305 (2012)), sets forth the requirements for competition. The statute mandates that "[t]he head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation." *Id*. at § 2305(b)(1).

For the Court to grant a permanent injunction, it must determine whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds

injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

## IV. Discussion

FSI challenges the award under the Solicitation on four grounds. First, FSI asserts that the Army failed to consider the offered $8.9 million price reduction contingent on FSI being awarded the follow-on contract as part of its best value analysis. Second, FSI asserts that the Army erred in favorably considering CAE's facility proposal estimates over its own in the best value analysis. Third, FSI asserts that the Army wrongly imposed an unstated requirement in its assessment of the G120TP aircraft, which worked against FSI in the analysis of its own proposed aircraft. Finally, FSI asserts several additional unequal and erroneous evaluations by the Army in its RFP award determination.

The Court here is tasked with determining whether the Army had a rational basis for each of the contested terms. If the Court finds that the procurement official's decision lacked a rational basis, the Army's actions are deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491.

### A. The bridge contract and the best value determination

#### 1. The Army did not treat FSI unequally

Initially, from the opening briefs, the Court was under the impression that FSI was arguing that it was irrational for the SSA not to consider the $8.9 million savings in the savings clause of the bridge contract under the evaluation criteria. For example, in its opening brief, FSI argued that $8.9 million deduction should have been considered by the SSA because "an agency may consider the consequences of existing (*i.e.* 'settled') contract terms that are triggered by an award decision because such costs are not proposed price reductions." Pl. MJAR at 17; quoting *Arch Chemicals, Inc. v. United States*, 64 Fed. Cl. 380 (2005). (*Arch* was a pre-award challenge to evaluation criteria, in which the court held that it would be irrational for the agency not to consider a cost saving in an existing contract in its price analysis.) In its reply brief and at oral argument, however, FSI clarified that it was not contending that the Army should have reduced FSI's evaluated price and that it was not challenging the RFP's price evaluation criteria:

> Nothing in FlightSafety's MJAR contends that the Agency should have reduced FSI's evaluated price . . . we did not challenge the RFP's price evaluation criteria. . . .

Pl. Reply 3.

> . . . FlightSafety merely asks that the Court hold that the Agency must treat offerors equally.

Pl. Reply 5.

After discussing *Arch Chemicals*, FSI writes:

> FlightSafety's protest presents the simpler question of fair treatment in considering how an award here would affect the Agency's other contracts. FlightSafety does not contend that its avoidable shutdown costs should be factored into the evaluated price. Nor does FlightSafety argue that its evaluated price should be lowered by such amount or that CAE's evaluated price should be increased by such amount. FlightSafety merely argues that the Agency should—as it did for CAE—consider the benefits to other contracts that result from selecting FlightSafety.

Pl. Reply 5.

Instead, FSI argues that it was not treated equally *under the best value determination* when the SSA credited CAE with savings on other contracts while the $8.9 price reduction was not considered.[3] *Id*. This argument is based on the two technical strengths that were assigned to CAE's proposal: (1) that CAE's simulators offer a reduced cost for easy upgrades; and (2) that CAE's offering to have a specific contractor, [. . .], on site reduces the need for travel to the subcontractor site as well as providing easier coordination with other Army training programs. Pl. MJAR 19; AR 2584, 2587, 2590. FSI argues that by considering these collateral benefits, the SSA looked at benefits outside the current training contract, "*i.e.* prospective price reduction under other contracts." Pl. MJAR at 19. In that the SSA took these benefits into consideration, it is FSI's contention that the SSA should have also then considered the "quantified, guaranteed, and immediate benefits resulting for an award to [FSI]." *Id*. at 20. That benefit, being the $8.9 million. This disparate treatment, argues FSI, is therefore unreasonable.

The Court disagrees. The Solicitation specified that the award would be made based on the best value tradeoff. AR 203. The Solicitation further provided the eight evaluation criteria: (1) Facilities; (2) Quality Control; (3) Management; (4) Staffing, Recruitment, and Retention; (5) Aircraft and Simulators; (6) Past Performance; (7) Small Business Participation; and (8) Price. AR 204. The Solicitation further advised that evaluation Factors 1-3 were to be rated acceptable or unacceptable and would not be included in the trade-off consideration. *Id*. In addition, Factors 4 (Staffing, Recruitment, and Retention and 5 (Aircraft and Simulators) were more important than Factors 6 (Past Performance) and 7 (Small Business Participation), *id*., and only Factors 4 through 6 would be included in the trade-off consideration, *id.* The evaluation factors 4-7, when combined, were to be weighed "approximately equal to price." *Id.* (Price was Factor 8.) Thus, the SSA was tasked with determining the strengths in each proposal and then comparing his findings within the parameters of the Solicitation. In order for FSI's price reduction to be considered, it was necessary, therefore, for FSI to have the price reduction included in Factor 8 in order for the price reduction to be considered at the stage of the best value

---

[3] In light of this decision, the argument that FSI waived its right to object to the exclusion of the price reduction from consideration under Factor 8 per *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 445 (Fed. Cir. 2007), is moot.

determination. There was no other factor that this price reduction would have fit. By contrast, the two strengths that FSI considers problematic were already included under Factors 4 and 5.[4]

In sum, when the SSA analyzed FSI's bid *under Factor 8*, the price reduction was not included by the SSA because it did not fit within the confines of the Solicitation under Factor 8, price, and FSI does not challenge this exclusion. Thus, having acquiesced in the SSA's exclusion of consideration of its price reduction in the SSA's evaluation of price under Factor 8 FSI cannot not now try to reintroduce the price reduction as a kind of unclassified "free radical" at the best value determination stage. Price reduction fits under Factor 8, "price"; it simply does not fit into any other factor found in the Solicitation.

As CAE states and the Court agrees:

> FSI has argued itself into a box from which it cannot escape. FSI concedes again that the Army could not have considered, as part of the Solicitation's price factor, the price reduction that FSI inserted into its existing contract. FSI Reply at 3, 5. And FSI fails again to identify any other evaluation factor in the Solicitation that would have permitted the Army to consider this price reduction. Because Agencies must "make an award based solely on the factors specified in the solicitation," 10 U.S.C. § 2305(b)(1); FAR 15.305(a), the Army could not consider the price reduction in FSI's existing contract as part of this procurement. *See FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 387-88 (2011) (holding that alleged cost savings outside the Solicitation's price evaluation scheme could not be considered in the agency's best-value tradeoff).

Int. Br. at 2.

The SSA was therefore rational in his decision not to consider the price reduction at the best value determination stage when all of the Factors were to be looked at and compared according to the terms of the Solicitation.

Furthermore, the SSA was true to the Solicitation in his evaluation of strengths to CAE. The Solicitation was clear that it was seeking "innovative ideas in training methodology and innovation in the equipment used for training. A proposal that has better training processes/procedures/simulators that ensures the best possible qualified pilots may be worth more to the government than a proposal that just meets the minimum needs." AR 206. As such, the strengths that the SSA attributed to CAE's proposal recognized the aspects of CAE's proposal that exceeded the requirements in a way beneficial to the Army, which was exactly what the Solicitation was looking for. *Id*. The SSA analyzed these efficiencies and cost savings within the scope of the Solicitation's technical factors, Factors 4 and 5. The SSA was not irrational in rating these as strengths.

---

[4] The Court also notes that the ease of upgrade was not an existing contract; therefore, this strength would not fall within FSI's objection to alleged inconsistent crediting of savings from external contracts.

However, even if this Court were to agree with FSI that the SSA was incorrect in assigning the two strengths referenced above to CAE, FSI has not provided the Court with an explanation as to how the procurement would be altered by removing these two strengths. Even without the reference to reduced travel, CAE still would have been credited with 11 strengths under Factor 4. Reduced travel attributed to only one element of one strength out of the 11 strengths assigned to it as the SSA found that use of specific subcontractors also "brings on-site expertise to the current programs [. . .]," and this "simplifies the development of future programs with their on-site presence." AR 2584. In addition, the SSA concluded that "[h]aving [specific subcontractor] personnel on-site will make consultation easier for the Army," AR 2587, and that [t]he Fort Rucker program, with these experts in place, will be a world class program," *id*. at 2596. Thus, CAE would still be credited for its teaming with a specific subcontractor. By comparison, FSI had only three strengths attributed to its proposal under Factor 4. Of those three strengths, the SSA found them to be "matched by similar strengths with CAE." *Id*. The SSA then attributed eight more strengths to CAE's proposal providing the Army with "innovation and creating an excellent 21st Century approach to flight training." AR at 2588. Thus, the strengths attributed to CAE's proposal under Factor 4 would still be far greater than that of FSI's proposal.

Under Factor 5, the SSA evaluated the proposed simulators. CAE's proposal gained 14 strengths, including "easy simulator upgrades." AR 2588-91. Even without the simulator upgrades strength, CAE would have more than three times as many strengths under Factor 5 as FSI – 13 TO 4 -- and CAE would still have zero weaknesses as compared to FSI's one weakness. Therefore, the Court cannot fathom that the SSA's conclusion that "CAE offers the most coherent and comprehensive training program" would be changed. AR 2591.

**2. The Army did not change its position**

FSI argues that if the Army could not consider the bridge contract in its best value determination, the FAR required the Army to advise it of that view during the competition. By not doing so, it is FSI's contention that the Army failed to conduct meaningful discussions and the Army misled FSI regarding the savings commitment the Army did not intend to consider. Simply put, FSI argues that the Army "changed positions" as to the applicability of the Solicitation criteria and, therefore, conducted misleading discussion with FSI. Pl. MJAR 14, 17-18.

FSI relies on *Raytheon Co. v. United States,* 809 F.3d 590 (Fed. Cir. 2015) in support of its argument. It is clear, after review, that *Raytheon* is not relevant to the case at hand. *Raytheon* did not involve agency action that was inconsistent with terms of the Solicitation. Nothing in *Raytheon* excuses FSI from failing to clarify the bridge contract price reduction prior to the deadline for revised proposals. FSI is the incumbent contractor and, as such, the Court can presume it a sophisticated government contractor. It is doubtless that FSI employed experienced drafters knowledgeable as to the FAR and appropriate regulations when it prepared and submitted its proposal. At best, if FSI believed the discussions misleading, FSI had a duty to seek clarification. *See Statistica Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1966) (rejecting protestor's argument that agency engaged in misleading discussion: "Even if we were

to assume that the State Department's discussions were misleading, Statistica had a duty to seek clarification.").

**B. Army's favorable consideration of CAE's facility in its best value analysis**

Next, FSI argues that the Army could not consider any aspect of CAE's facility except on a pass/fail basis under Factor 1. The Government and Intervenor disagree. According to these parties, it is well within the Army's discretion to assign facility-related strengths to CAE under Factor 4 (Staffing, Recruitment and Retention) and Factor 5 (Aircraft and Simulators).

The Court does not agree with FSI that any mention of the word "facilities" outside the confines of Factor 1 to be impermissible. In fact, if the Court were to agree to such a restriction, such would frustrate the Solicitation's goal of obtaining the "best overall offer." AR 202. The Army's consideration of facilities was reasonable and consistent with the RFP, and it was well within the Army's discretion to assign facility-related strengths to CAE. Under *ACC Constr. Co. v. United States*, 122 Fed. Cl. 663, 671-72 (2015), "[f]or a protestor to successfully claim that an agency relied on an unstated factor, it must show that the agency used a 'significantly different basis' than the stated factors when evaluating the proposal, which resulted in prejudice to the protestor." In addition, "[t]he general rule is that an 'agency is not precluded from considering an element of a proposal under more than on evaluation criterion under which it is considered." *Office Depot, Inc. v. United States*, 95 Fed, Cl. 517, 533 n.18 (2010) (citations omitted).

Here, the SSA took aspects of CAE's facilities into account under Factor 4 to consider the "offeror's approach to handling surge/contingency operations, fluctuation in mission requirements, and delay due to weather and unforeseen events." AR 205. With regard to Factor 5, the SSA considered "any idea that would improve the quality of training." AR 206. These were all to be considered under the best value analysis. Therefore, the SSA did not err in recognizing the positive impact of certain aspects of CAE's proposed facilities on Factors 4 and 5. The SSA's decision was thus rationally justified in considering "facilities" under Factors 1, 4, and 5 as part of its total award decision.

C. **Army's unstated aircraft requirement evaluation**

FSI also alleges that the Army imposed an unstated evaluation criterion when judging contract proposals, *i.e.* the selection of an acrobatic performance aircraft, like the Grob G120TP, for Stage 1 training in violation of CICA. FSI alleges that the SSA applied multiple strengths to CAE's proposal's promotion of the Grob G120TP, effectively weighing the consideration of CAE's proposal unfairly in its favor despite what FSI claims were aircraft from its own proposal more directly similar to the Army's current C-12 aircraft, the Piper M500 and Extra 330LX.

With respect to the evaluation criteria the Army planned to use, the Solicitation states that "[t]he Government is looking for innovative ideas in training methodology and innovation in the equipment used for training." AR at 145. Improvement of flight training was among the principal bases upon which the SSA reached its decision to award the contract to CAE. When it compared the existing C-12 aircraft currently in use with CAE's Grob G120TP and FSI's Piper

500, the SSA found the two aircraft broadly similar, but awarded the Grob G120TP significant strengths related to its "turbine engine, retractable tricycle landing gear, [and] side-by-side seating", all features shared with the C-12 and which are valuable where the goal of using any training aircraft is to produce pilots proficient in the operation of the C-12 aircraft. AR 2589. The SSA also recognized the Grob G120TP as a trusted military trainer aircraft for other foreign militaries, suggesting a reduced level of risk in using the Grob G120TP for its own training purposes. AR 2592. In contrast, the Piper M500 was neither built nor sold as a trainer aircraft, suggesting it is built for use by "experienced pilots" rather than anyone engaged in "ham-handed flying." *Id*. Where FSI proposed two aircraft for training, the Piper M500 and the Extra 330LX, CAE's proposal anticipated using the Grob G120TP for both single-engine training and upset recovery training, a unity of purpose which the SSA described as providing "greater pilot proficiency because the flight hours and maneuvers are contained in the one aircraft. Continuity is one of the Best Value Goals." *Id*. Additional strengths were awarded to CAE's proposal for its anticipated simulation technologies, review programs, and efficient training protocols, all advantages tied to the planned use of the Grob G120TP. *Id*.

The SSA identified several strengths in FSI's proposal, including the engine, landing gear, and seating characteristics (plus yoke controls common to the C-12), upgraded simulators and training devices such as iPads, and greater passenger manifest to allow for observation by additional students. AR 2591. However, the SSA also foresaw FAA endorsement concerns not present with the Grob G120TP. *Id*. Ultimately, the SSA described the Grob G120TP as "the superior aircraft proposed for single engine and URT training, in that it more closely resembles the C-12 aircraft that we are ultimately training our soldier to fly." AR 2592. The bifurcated nature of FSI's proposed trainer aircraft and facility model, compared to the Grob G120TP's overall track-record as a trainer aircraft for other militaries, and additional cost, time, and resource savings associated with unified facility and aircraft resources, ultimately played a significant role in the contract award to CAE. AR 2592-93.

The Court's role is not to second-guess the Agency's decision; its job is only to determine whether that decision was rational. *Honeywell v. United States*, 870 F.2d 644, 647 (Fed. Cir. 1989). In reviewing the SSA's award in conjunction with the Solicitation, the Court determines that the Army's decision to significantly favor CAE's Grob G120TP proposal over FSI's combined Piper M500 / Extra 330LX proposal was rationally based in the solicitation's central aim of identifying innovative training methodologies and equipment to best produce the most qualified pilots possible, with an eye both to the specific technical characteristics of each offeror's proposed aircraft and instruction technologies as well as to potential long-term savings and training opportunities.

For example, FSI argues that the necessary upset recovery training demanded by the Solicitation was "a relatively small amount" of training that it could adequately perform via the Extra 330LX, a smaller acrobatic aircraft that could effectively replicate the sort of maneuvers typical of upset recovery training. Pl. MJAR at 27. The SSA demonstrates that, in assessing the potentially innovative nature of the FSI's and CAE's proposals, it found the need for two different aircraft in FSI's proposal disruptive to the sought-after goals of continuity and

efficiency in training. The necessary travel time between the different planes' hangar locations, as well as the need for pilots to familiarize themselves with both the Piper M500 and the Extra 330LX, were a burden on the pilot proficiency training that could not be sufficiently offset but other benefits of FSI's plan. AR 2591-92. By contrast, the CAE plan's use of only a single trainer aircraft for both forms of training would ensure student pilots were not required to learn to operate an additional aircraft, saving time and unifying training flight hours at once. *Id.*

Furthermore, the Grob G120TP is designed specifically as a trainer aircraft and shares key similarities with the C-12 which pilots must ultimately be able to fly, characteristics lacking in the two aircraft proposed by FSI. AR 2596. The Piper M500 is neither built nor marketed as a trainer, limiting its utility for training inexperienced pilots. AR 2592. The Extra 330LX, for its part, has different landing gear from either the Piper M500 or the C-12, necessitating additional training and acclimation on the part of the student, lacks a full suite of instruments, and handles differently from the C-12, all of which handicap its usefulness as a trainer for upset recovery maneuvers as compared to the Grob G120TP. *Id.* The Grob G120TP's landing configuration, instrument packages, training-intended manufacture, and widespread use as a trainer elsewhere all positively weighted that aircraft in contrast to the aircraft in FSI's proposal. *Id*.

The Solicitation includes, among possible innovations listed in a non-exhaustive list, "Continuity of Operational Flight Program Training," indicating that the SSA clearly anticipated such continuity as a valuable potential innovation which it might consider as one key determining factor in deciding to whom to award the contract. AR 146. While FSI asserts that it has provided training via multiple aircraft in the past, CAE's unified training regime in one aircraft that meets or exceeds its existing requirements without necessitating travel to a different location for the upset recovery portion of the training program represents a desired innovation which the SSA was rationally justified in considering and valuing as part of its total award decision.

The SSA did not totally ignore or dismiss factors which favor FSI's proposal with respect to aircraft selection, recognizing simulator upgrades, greater carrying capacity in the Piper M500, and broad similarities between the two proposed aircraft to the Beechcraft C-12 for which training would ultimately be necessary. AR 2591. The SSA's ultimate conclusion in favor of CAE, however, was not irrational, and as the Court is not prepared to question the substance of the Agency's decision, it does not find fault with the rationality of its preference for the Grob G120TP aircraft central to CAE's plan.

**D. Other claims of inequality**

Again, the Court's role is not to second-guess the Agency's decision; its job is only to determine whether that decision was rational. *Honeywell*, 870 F.2d at 647. Keeping this in mind, the Court again must determine whether the SSA's decision with regard to FSI's last complaints was, in fact, rational.

FSI's complaint that the Army awarded a strength to CAS for exceeding the requirements of the Solicitation, AR 2548, is obviously rational. Specifically, the SSA awarded a strength to CAE for its [. . .] that would limit maintenance issues in aircraft and simulators. *Id*. As the Solicitation is to provide training in aircraft and on simulators, it is rational that limited downtime could be nothing less than a strength.

FSI's next complaint, is that the SSA irrationally awarded a strength to CAE for its proposal to [. . .]. *Id*. The conclusion by the SSA to assign a strength to CAE for the upgrade in training is rational and in keeping with the Solicitation's goals.

FSI further complains that a weakness should have been assigned to CAE for the 2-seated Grob because there would not be any room for a Government employee to accompany trainees on flights. Again, the SSA found that CAE offered [. . .], AR 2354, 2361, 2369, which was one of the three acceptable methods of review under the Solicitation.

And finally, FSI argues that is should have awarded a strength for its "new aircraft." AR 1918. As the SSA found, the only thing new was a "factor installed Garmin G1000 fully integrated glass panel flight deck." *Id*. Nothing else was found to be "new" by the SSA. Again, the Court will not second-guess the SSA's findings with regard to these claims.

The SSA's decision clearly shows that the upgrades and reduced costs recognizes an aspect of CAE's proposal that exceeds requirements and that are beneficial to the Government. Thus, the SSA's conclusions were all rationally based. However, even if the Court were to find that the SSA was irrational his findings here, the SSA's final conclusion that FSI's overall training was inferior to that as proposed by CAE would still stand. AR 2588. As the SSA stated "[CAE's] strengths are not just about numbers. These additional strengths represent innovation and creating an excellent 21st Century approach to flight training." *Id*. Thus, the Court cannot find the SSA's decision was one that was irrational.

## V. Conclusion

In order to succeed on a protest, a protestor "must show that there was a 'substantial chance' it would have received the contract award but for the errors" it alleges. *Bannum v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005). FSI has not done so. Therefore, for the above reasons the Court **GRANTS** Defendant and Intervenor's Motions for Summary Judgment on the Administrative Record and **DENIES** Plaintiff's Motion for Summary Judgment on the Administrative Record. The Court **DENIES AS MOOT** Plaintiff's Motion for Injunctive Relief. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge